IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| EMMA MASON, | ) | |
|---|---|---|
| Plaintiff, | ) | |
| vs. | ) | 2:08cv902 |
| | ) | Electronic Filing |
| TRANSPORTATION SOLUTIONS, | ) | |
| Defendant. | ) | |

## OPINION

Plaintiff Emma Mason commenced this suit against her employer, Transportation Solutions, seeking redress for alleged retaliation and wrongful termination based on gender and age discrimination. Presently before the court is defendant's motion for summary judgment. For the reasons set forth below, defendant's motion will be granted in part and denied in part. The motion will be granted as to plaintiff's age discrimination claim and denied in all other aspects.

Federal Rule of Civil Procedure 56(c) provides that summary judgment may be granted if, drawing all inferences in favor of the non-moving party, "the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law." Summary judgment may be granted against a party who fails to adduce facts sufficient to establish the existence of any element essential to that party's claim, and upon which that party will bear the burden of proof at trial. Celotex Corp. v. Catrett, 477 U.S. 317 (1986). The moving party bears the initial burden of identifying evidence which demonstrates the absence of a genuine issue of material fact. When the movant does not bear the burden of proof on the claim, the movant's initial burden may be met by demonstrating the lack of record evidence to support the opponent's claim. National State Bank v. National Reserve Bank, 979 F.2d 1579, 1582 (3d Cir. 1992). Once that burden has been met, the non-moving party must set forth "specific facts showing that there is a genuine issue for trial," or the factual record will be taken as presented by the moving party and judgment will be entered as a matter of law. Matsushita Electric Industrial Corp. v. Zenith Radio Corp., 475 U.S. 574 (1986) (quoting Fed.R.Civ.P. 56 (a), (e)) (emphasis in

Matsushita).  An issue is genuine only if the evidence is such that a reasonable jury could return a verdict for the non-moving party.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242 (1986).

In meeting its burden of proof, the "opponent must do more than simply show that there is some metaphysical doubt as to the material facts."  Matsushita, 475 U.S. at 586.  The non-moving party "must present affirmative evidence in order to defeat a properly supported motion" and cannot "simply reassert factually unsupported allegations."  Williams v. Borough of West Chester, 891 F.2d 458, 460 (3d Cir. 1989).  Nor can the opponent "merely rely upon conclusory allegations in [its] pleadings or in memoranda and briefs."  Harter v. GAF Corp., 967 F.2d 846 (3d Cir. 1992).  Likewise, mere conjecture or speculation by the party resisting summary judgment will not provide a basis upon which to deny the motion.  Robertson v. Allied Signal, Inc., 914 F.2d 360, 382-83 n.12 (3d Cir. 1990).  If the non-moving party's evidence merely is colorable or lacks sufficient probative force summary judgment must be granted.  Anderson, 477 U.S. at 249-50; see also Big Apple BMW, Inc. v. BMW of North America, 974 F.2d 1358, 1362 (3d Cir. 1992), cert. denied, 113 S.Ct. 1262 (1993) (although the court is not permitted to weigh facts or competing inferences, it is no longer required to turn a blind eye" to the weight of the evidence).

The record as read in the light most favorable to plaintiff establishes the background set forth below.  Plaintiff was hired by defendant on June 19, 2005 as a shuttle bus driver.  Defendant is a transportation company with 112 employees, which contracts with UPMC to provide shuttle services for UPMC's employees from various parking lots to UPMC buildings.  According to defendant's contract with UPMC, shuttle routes must be strictly followed to ensure the timely pick up of employees so they can report to work.

Plaintiff was fifty-three years of age at the time she was hired.  Elnora Briston, a female then fifty-five years of age, hired plaintiff and was plaintiff's supervisor during her first year of employment.  Plaintiff received five disciplinary warnings during the time she was under Briston's supervision.  The first of these was a verbal warning on February 28, 2006.  According to Briston's notes, security called Briston to report that plaintiff was smoking on her shuttle and was blocking the street in front of the hospital.  Plaintiff admits that she received this verbal

warning. On March 3, 2006, Briston issued a formal written warning to plaintiff after she was observed smoking on her shuttle by defendant's vice president. The warning also included allegations that plaintiff harassed another employee, which plaintiff denies doing.

Plaintiff received another written warning from Briston on April 11, 2006, for calling off at the last minute. Defendant requires employees to give at least two hours notice when calling off a scheduled work shift, and plaintiff had contacted Briston at 1:17 pm when her shift was due to begin at 2:00 pm.

Plaintiff received her last written warning from Briston on August 7, 2006 for excessive call offs. Plaintiff called off on Monday and Friday in the same week due to an aunt passing away, and then contacted Briston the night before a scheduled shift on the following Monday to tell her she was in New York to handle her deceased aunt's paperwork. Briston issued the final written warning because she "had to continually find coverage for [plaintiff's] shift without much notice." August 7, 2006, Written Warning to Emma Mason, Defendant's Exhibit J (Doc. No. 29-4) at 4.

In June of 2006, Ted Hill became Acting Supervisor and assumed the supervision of shuttle bus drivers, including plaintiff. Many drivers initially resisted Hill's method of supervision because he was stricter than past supervisors and "wrote up many employees." Defendant's Motion (Doc. No. 27) at ¶ 9. Defendant claims that the increase in write-ups was at the insistence of Dwight Mayo, the president of Transportation Solutions, because "he felt things had been lax for far too long." Id.

Over the course of five months Hill issued nine disciplinary warnings to plaintiff. Plaintiff was first disciplined by Hill on August 18, 2006 for taking a bus which she had not been given permission to drive. As a consequence plaintiff was issued a written warning for "being insubordinate." Plaintiff refused to sign the written warning and met with Hill and Mayo to explain that the allegations in the warning were false. Mayo assured plaintiff that if there were no more problems, the warning would be removed from her file. Hill also wrote plaintiff up several times for failing to follow company dress code. Plaintiff contests that she ever was actually out of uniform, and asserts that the few times she was, Briston gave her permission to do

3

so. Phil Davis, a former manager for defendant, testified that plaintiff always was in proper uniform.

At the end of 2006, plaintiff was issued several more warnings from Hill for turning in an unverifiable excuse, failure to come to work, failure to call off and improperly parking a company vehicle. Hill also issued a warning to plaintiff for failing to attend a mandatory staff meeting. Plaintiff contends that she asked and received permission from Hill to miss the meeting because she had a personal matter to tend to that day, but Hill wrote her up for missing the meeting anyway.

Plaintiff complained to Briston about Hill's treatment sometime in January 2007. Testimony of Elnora Briston, Plaintiff's Exhibit 9 (Doc. No. 36-2) at 32. When she complained about Hill a second time, Briston instructed plaintiff to write her concerns in a statement. Plaintiff composed a memorandum, dated January 22, 2007, titled "Complaint of Harassment and Discrimination Against Mr. Ted Hill." Although plaintiff did not mention age or gender in the memo, she did mention that she was complaining about "repeated discrimination" and harassment, among other things. Plaintiff detailed how she was subject to unwarranted discipline by Hill and informed defendant that "if [she] was not satisfied with the remedy Transportation Solutions have put [sic] forward, [she would] submit [her] case to the EEOC." January 22, 2007 Memorandum by Emma Mason. Briston testified that she passed this statement on to Mayo. Mayo testified that he was aware at the time that the EEOC investigates charges of unlawful discrimination.

After he received the January memo, Mayo held a meeting with Hill and Briston to discuss plaintiff's problems with Hill and thereafter directed Briston to monitor plaintiff. Briston testified that Hill "backed off of Emma" at that point. Briston said she herself continued to have problems with plaintiff after she again became plaintiff's supervisor, but defendant's records show that plaintiff did not receive any disciplinary warnings from December 11, 2006 until defendant terminated her in June 2007.

The record shows that Hill regained supervisory control over plaintiff sometime in May 2007 when Briston was promoted. Briston testified that plaintiff continued to take too long at

4

certain stops, bypass some stops, take unauthorized roads and deviate from her route. In an effort to remedy the route deviation problem, Hill testified that he rode with plaintiff to "retrain" her on her route in early June 2007.

Hill testified that on June 12, 2007, plaintiff sat at the Children's Hospital route and let her bus completely fill with customers. Because her bus was filled, she was unable to stop along the route and pick up additional passengers. When Hill questioned plaintiff about deviating from her route, he claims plaintiff slammed the door in his face and drove away. Plaintiff contends that she did not do this, and that, in any event, other drivers often announced over the radio when they were at full capacity and had to go past stops.

On June 13, 2007, Briston, Hill and another manager scheduled a meeting to discuss the incident with plaintiff. Hill advised plaintiff over the radio to attend this meeting when her shift ended at 10:00 am. Plaintiff responded and told Hill she was unavailable to attend the meeting because she had a personal matter to tend to after her morning shift ended. Plaintiff asked Hill if she could attend later in the day, before her afternoon shift was scheduled to begin. Hill testified that he made arrangements for a substitute driver to continue plaintiff's morning route so she could attend the meeting, and went to pick plaintiff up at her bus sometime between 8:00 and 8:40 am. When he picked up plaintiff, she requested that he drop her off at her car so she could drive to the office and leave for her appointment thereafter. Hill testified that he dropped plaintiff off at her car, but plaintiff never showed up at the meeting. Plaintiff contends that Hill never told her to follow him to the office, and that he simply showed up to relieve her from her route which lead her to assume that she could first attend her appointment and then come back for the meeting before her afternoon shift began. She claims that Hill did not tell her why he was picking her up or that he and the other managers still intended to meet with her in the morning.

At 9:40 am, Hill phoned plaintiff and asked her why she was not at the office. Plaintiff then inquired why he was waiting for her at the office when she had told him she would be there in the afternoon. A short while later, Hill called plaintiff again and told her not to bother coming in the afternoon, she would be receiving a termination letter and was no longer permitted on company property.

5

Plaintiff received a termination letter dated June 13, 2007, from Hill stating she was terminated because of her failure to comply with her route schedule on June 12, 2007 and for being insubordinate by not attending the meeting on June 13, 2007. Plaintiff claims that Hill "set her up" by telling her she did not have to come to the meeting until her afternoon shift began. Davis testified that after plaintiff's employment was terminated Hill was "jubilant" and he heard him say "I finally got that black bitch."

After plaintiff was terminated, Gerald Fisher, a sixty-nine year old male, was assigned to her route. Fisher's route subsequently was assigned to a variety of drivers.

On August 1, 2007, plaintiff timely filed a charge with the EEOC. Plaintiff instituted this lawsuit after receiving a right to sue letter. Her complaint advances claims under Age Discrimination in Employment Act (ADEA), 29 U.S.C. 626(c)(1), Title VII of the Civil Rights Act of 1964, 42 U.S.C. 2000e 2(a)(1), and the Pennsylvania Human Relations Act, 43 Pa. Const. Stat. 951 et seq. The complaint asserts that defendants discriminated against her based on age and gender. It further avers that defendant unlawfully retaliated against plaintiff after she threatened to file a charge with the EEOC, .

Defendant moves for summary judgment on all counts. It contends that it terminated plaintiff for legitimate business reasons, namely, her extensive disciplinary history and disruption of defendant's workplace. It asserts that plaintiff has failed to establish a prima facie case that would give rise to an inference of gender or age discrimination. Conversely, plaintiff maintains that there are genuine issues of material fact in dispute on her discrimination claims and when the record is read in the light most favorable to her, she has met her burden to show that defendant was motivated by discriminatory animus.

Plaintiff's claims for gender discrimination and retaliation survive by the narrowest of margins; she has failed to advance sufficient evidence to support her age discrimination claim.

It is well-settled that claims of discrimination based on circumstantial evidence are to be evaluated at summary judgment using the shifting burdens of proof initially established by the Supreme Court in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973). St. Mary Honor Center v. Hicks, 509 U.S. 502, 506 (1993); Waldron v. SL Industries, Inc., 56 F.3d 491, 495 (3d

6

Cir. 1995) (citing Fuentes v. Perskie, 32 F.3d 759, 764 (3d Cir. 1994)).  Under this framework the parties' respective evidentiary burdens have been summarized as follows:

> First, the plaintiff has the burden of proving by the preponderance of the evidence a prima facie case of discrimination. Second, if the plaintiff succeeds in proving the prima facie case, the burden shifts to the defendant to articulate some legitimate, nondiscriminatory reason for the [adverse employment action]. Third, should the defendant carry this burden, the plaintiff must then have an opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination.

Texas Department of Community Affairs v. Burdine, 450 U.S. 248, 252-253 (1981) (citation omitted).

Under the indirect evidence approach a plaintiff must present a prima facie case of discrimination. Keller v. Orix Credit Alliance, Inc.,130 F.3d 1101, 1108 (3d Cir. 1997). The major purpose of the prima facie case is to eliminate the most obvious lawful explanations for the defendant's adverse employment action and raise a presumptive inference of discrimination. Pivirotto v. Innovative Systems, Inc., 191 F.3d 344, 352 (3d Cir. 1999) (citing Burdine, 450 U.S. at 253-54 ("[t]he prima facie case serves an important function in the litigation: it eliminates the most common nondiscriminatory reasons for the plaintiff's rejection.")). A prima facie case raises an inference of discrimination because the presumed circumstances, if left unexplained, indicate it is likely that the defendant's actions were based on consideration of impermissible factors. Id. (quoting Furnco Construction Corp. v. Waters, 438 U.S. 567, 577 (1978)).

There is no talismanic formula for presenting a prima facie case. Jones v. School District of Philadelphia, 198 F.3d 403, 411 (3d Cir. 1999) ("the elements of a prima facie case depend on the facts of the particular case"). The relevant inquiry is whether the plaintiff has suffered an adverse employment action under circumstances which raise an inference of unlawful discrimination. Waldron, 56 F.3d at 494. Plaintiff's burden at this step is "minimal" and is viewed as a means of presenting a sensible, orderly way to evaluate the evidence in light of common experience as it bears on the critical question of discrimination. Id.; see also Furnco, 438 U.S. at 577.

If the plaintiff presents a prima facie case, the second stage of the McDonnell Douglas paradigm requires the defendant to articulate a legitimate explanation for the adverse employment action. Keller, 130 F.3d at 1108. The defendant's burden at this step is one of production, not persuasion, and the court's consideration of it "can involve no credibility assessment." St. Mary's Honor Center, 509 U.S. at 509. If the defendant meets this burden, the presumption of discrimination created by the prima facie case "drops" from the case. St. Mary's Honor Center, 509 U.S. at 511; Reeves v. Sanderson Plumbing Products, Inc., 530 U.S. 133, 143 (2000).

Once the defendant has met its burden of production and provided a legitimate explanation for its adverse employment action, the court's analysis turns to the third and final step of the inquiry, which is usually the most critical in resolving a motion for summary judgment. Jones, 198 F.3d at 410. At this juncture the plaintiff must be afforded the "opportunity to [present evidence that is sufficient to] prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination." Burdine, 450 U.S. at 253. At trial, the plaintiff must have evidence that could convince the finder of fact "both that the [defendant's] reason was false, and that discrimination was the real reason." St. Mary's Honor Center, 509 U.S. at 515. This is because while the burden of production under the McDonnell Douglas analysis shifts, "the ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." Jones, 198 F.3d at 410 (quoting Burdine, 450 U.S. at 252-53 (1981)).

In general, a plaintiff may establish a prime facie case by demonstrating that (1) she is a member of a protected class, (2) she was qualified for the position, (3) she suffered an adverse employment action, and (4) the circumstances raise an inference of discrimination, such as where similarly situated individuals outside the protected class were treated more favorably. See Swierkiewicz v. Sorema N.A., 534 U.S. 506, 510 (2002); see also Sheridan v. E. I. DuPont de Nemours & Co., 100 F.3d 1061, 1066 n. 5 (3d Cir. 1996) (en banc), cert. denied, 521 U.S. 1129 (1997) (discussing nature and purpose of prima facie case). The central focus of the inquiry is

8

always whether the employee is being treated less favorably because of race, religion, sex or national origin. Pivirotto, 191 F.3d at 352 (quoting International Bhd. of Teamsters v. United States, 431 U.S. 324, 335 n. 15 (1977)). The plaintiff ultimately must be able to produce "evidence adequate to create an inference that an employment decision was based on an illegal discriminatory criterion." Id. at 355. (quoting O'Connor v. Consolidated Coin Caterer's Corp., 517 U.S. 308, 312 (1996)).

**1.      Plaintiff's Gender Discrimination Claim under Title VII**

The record clearly shows that plaintiff has advanced a prima facie case of gender discrimination. Plaintiff, a female, is a member of a protected class, was qualified for the position and was terminated. Additionally, plaintiff was replaced by someone outside of the protected class, which is indisputably one way to satisfy the fourth prong of her prima facie claim. Smith v. Davis, 248 F.3d 249, 253 (3d Cir. 2001).

Defendant has advanced multiple, legitimate reasons for why plaintiff's employment was terminated. As noted earlier, plaintiff received fourteen disciplinary actions from Briston and Hill over the course of her two year employment with defendant. Briston testified that plaintiff was unwilling to follow the rules, which resulted in warnings for infractions that included smoking on her shuttle, calling off at the last minute and calling off excessively.

Plaintiff had other disciplinary problems as well. As noted above, Briston testified that plaintiff was issued a warning for harassing a co-worker and refusing to move her shuttle while parked in an unauthorized area. She also recounted that plaintiff was defiant when asked to change her behavior. Briston's testimony that plaintiff was unwilling to follow the rules is corroborated by the accounts of other managers and co-workers. Plaintiff herself admitted that she would deviate from her route when she thought there was too much traffic and could get customers to their stops more quickly by going a different route, though she claims other drivers also routinely did this. Mayo and Hill also testified that they received complaints about plaintiff from shuttle riders, co-workers and UPMC security.

9

To be sure, defendant has presented substantial, legitimate, business reasons for terminating plaintiff. Therefore, the presumption of discrimination created by plaintiff's prima facie case "drops" from the case. St. Mary's Honor Center, 509 U.S. at 511; Reeves v. Sanderson Plumbing Products, Inc., 530 U.S. 133, 143 (2000). To survive summary judgment, plaintiff must now either 1) present sufficient evidence to cast substantial doubt upon defendant's proffered reasons for terminating her, or 2) come forward with sufficient evidence from which a factfinder could reasonably conclude that an illegitimate factor more likely than not was a motivating factor or determinative cause of the adverse employment action (e.g., by showing that defendant had subjected her to discriminatory treatment and treated similarly situated persons not in the protected class more favorably). Fuentes, 32 F.3d at 762. Viewing all of the evidence in the light most favorable to plaintiff, she has raised a material issue of fact as to the second ground.

Despite her extensive disciplinary history, the context and circumstances appear to provide sufficient support for a finding that plaintiff's disciplinary history was not the real reason for her termination, but pretext. First, the record reveals that plaintiff and Hill had a tumultuous relationship even in the early days of plaintiff's employment. Plaintiff and Hill often had disputes over whether plaintiff had violated company policy, which resulted in plaintiff refusing to sign written disciplinary warnings issued by Hill on several occasions. When plaintiff was written up for a dress code violation on November 8, 2006, she refused to sign the document because, according to plaintiff, she was complying with the dress code. Interestingly, although the document shows Hill's writing indicating "refused to sign," the document also shows plaintiff's signature at the bottom. Plaintiff testified that she signed the document because Hill threatened to send her home for the day if she did not. Deposition of Emma Mason, Plaintiff's Exhibit 1 (Doc. No.  ) at 44-45. Thus, the finder of fact could conclude that Hill disciplined plaintiff for things she did not do and failed to take into account things she did do.

Indeed, plaintiff and Hill's relationship became so acrimonious that plaintiff submitted a written memorandum entitled "Complain of Harassment and Discrimination against Mr. Ted Hill" detailing how Hill allegedly had subjected her to unwarranted discipline. This ultimately

led Mayo to remove Mason from Hill's supervision sometime in early 2007. Nevertheless, the record shows, and defendant admits, that Hill continued to keep handwritten notes on plaintiff's actions.

Second, the events that took place both before and after Hill regained supervision of plaintiff also raise an inference of discriminatory motive. Briston's testimony revealed that she and Hill spoke with Mayo in early June about plaintiff's disciplinary problems and showed him "all the stuff that she had done." Briston's Testimony (Doc. No. 36-2) at 10. Mayo then told Briston and Hill to "make a decision on what [they thought] should be done," and ultimately gave Briston and Hill discretion over whether to terminate plaintiff. Id. Plaintiff received her termination letter from Hill, not Mayo. Hill's comments that he "finally got that black bitch" could lead a jury to infer that plaintiff's gender played a role in Hill's decision about plaintiff' termination. Taking all of this together, a jury could reasonably conclude that Hill ultimately was the one who made the decision to terminate plaintiff and her gender was a substantial factor in his decision to do so.

Additionally, plaintiff raises a timing argument which could further support a factfinder's determination that plaintiff was subject to discriminatory treatment by Hill. Once Briston regained supervision over plaintiff, plaintiff did not receive any additional written disciplinary actions.[1] Conversely, plaintiff's disciplinary problems seemed to re-blossom once Hill regained supervisory control over plaintiff in May 2007, and plaintiff was terminated just a few weeks later.

As has been frequently noted, "[t]he question is not whether the employer made…a sound business decision; it is whether the real reason is discrimination." Keller, 130 F.3d at 1109. While the record does demonstrate that plaintiff had a serious disciplinary history, disputed issues of material fact remain on whether gender played a part in Hill's decision to terminate plaintiff. Because it appears at this juncture that a reasonable jury could find that Hill, acting on

---

[1]Briston testified, however, that she did verbally reprimand plaintiff and noted an incident when plaintiff refused to work because Briston had given plaintiff's bus to another driver. However, this incident was never documented.

behalf of defendant, was motivated by discriminatory animus, defendant's motion for summary judgment on plaintiff's Title VII gender discrimination claim must be denied.

**2.	Plaintiff's Age Discrimination Claim under the ADEA**

In order for plaintiff's ADEA claim to survive summary judgment she must first establish a prima facie case of age discrimination. Plaintiff must show that she 1) is over forty years of age; 2) is qualified for the position; 3) suffered an adverse employment action, and 4) was replaced by a sufficiently younger person to create an inference of age discrimination. Chippollini v. Spencer Gifts, Inc., 814 F.2d 893 (3d Cir. 1987). Defendant concedes that plaintiff was over forty and qualified for the position of shuttle driver, but argues that she has not established a prima facie case because she was not replaced by a sufficiently younger person. Instead, she assertedly was replaced by a male who was sixty nine years of age.

In an effort to overcome this problem, plaintiff argues that Fisher was moved to plaintiff's route after she was fired and, given defendant had hired numerous younger drivers before and after plaintiff was terminated, a reasonable jury could conclude that defendant "back filled" Fisher's position with younger drivers and put Fisher on plaintiff's route. There is just one problem with this theory: the idea that defendant discriminated against *plaintiff* by filling *Fisher's* route with younger employees is devoid of any supporting proof. While defendant did hire younger workers around the time it terminated plaintiff, defendant also hired several employees who were over the age of forty. Indeed, plaintiff has not been able to identify which if any of these younger drivers "back filled" Fisher's route. Other than her conclusory statements that defendant "back filled" Fisher's position, and that Hill treated younger employees more favorably than her, there is nothing in the record to indicate that either of these propositions actually occurred. Accordingly, we agree that plaintiff has failed to meet her burden on this claim and defendant's motion for summary judgment on plaintiff's age discrimination claim under the ADEA must be granted.

### 3. Plaintiff's Retaliation Claim under Title VII and the ADEA

To establish a prima facie case of retaliation under the ADEA or Title VII, a plaintiff must show: 1) she engaged in a protected activity; 2) an adverse employment action occurred, and 3) a causal connection exists between the employee's protected activity and the adverse action. Krouse v. Amer. Sterilizer Co., 126 F.3d 494 (3d Cir. 1997). In the absence of direct evidence of retaliation, retaliation claims under the ADEA and Title VII proceed under the McDonnell Douglas burden-shifting analysis highlighted above. Fasold v. Justice, 409 F.3d 178, 188 (3d Cir. 2005).

Plaintiff asserts that she engaged in protected activity when she wrote the January 22, 2007 memorandum to her supervisors asking that Hill's behavior towards her be remedied. Defendant, however, disputes that plaintiff's letter is protected activity within the meaning of Title VII and the ADEA. It notes that the letter never mentions gender or age discrimination. And, in any event, the six-month period between January 2007 and June 2007 does not suggest retaliation because of a lack of temporal proximity between the two events.

Title VII's anti-retaliation provisions protect employees who participate in Title VII's statutory processes or who otherwise oppose employment practices made illegal by Title VII. Laughlin v. Metro. Wash. Airports Auth., 149 F.3d 253, 259 60 (4th Cir. 1998). Opposition to an illegal employment practice must identify the employer and the challenged practice, if not specifically, at least by context. Curay Cramer v. Ursuline Acad. of Wilmington, Del., Inc., 450 F.3d 130, 134-35 (3d Cir. Del. 2006). For example, in Barber v. CSX Distribution Services, 68 F.3d 694 (3d Cir. 1995), the Third Circuit held that a letter written by Barber to his employer's human resources department was not protected activity because it did not specifically complain about age discrimination. Id. at 701. Barber's letter complained about unfair treatment and expressed his dissatisfaction with the fact that someone else was awarded the position, but it did not specifically complain about age discrimination. Id. The Court found the letter was too vague to constitute opposition to an unlawful employment practice because it neither "explicitly or implicitly" alleged that a protected characteristic was the basis for the adverse employment

13

action.  The Court held that "a general complaint of unfair treatment does not translate into a charge of illegal age discrimination."  Id.

From defendant's perspective, plaintiff's January memorandum does nothing more than list her complaints about unfair treatment by Hill.  But unlike the plaintiff in Barber, plaintiff here clearly identified that her memo was addressing "repeated discrimination" by Hill.  Although plaintiff did not specifically mention that her age or gender was his motivation, it is clear that plaintiff was putting defendant on notice that compared to other drivers she was being treated differently by Hill.  Importantly, plaintiff concluded her memo by asking for an appropriate remedy for the harassment and stated, that if she was "not satisfied with the remedy [defendant] put[s] forward [she would submit her case] to the EEOC."  Plaintiff's Letter of January 22, 2007 (Doc. No. 36-1).

Despite defendant's argument that plaintiff was not actually alleging discrimination, it is difficult to understand why she would threaten to go to the EEOC unless she believed she was the victim of unlawful discrimination.  Indeed, Mayo testified that he was aware of the types of claims that the EEOC handled – unlawful discrimination claims – at the time plaintiff submitted her memo.  The Third Circuit has recognized that protected conduct includes more than the formal filing of charges before the EEOC.  See  Curay Cramer v. Ursuline Acad. of Wilmington, Del., Inc., 450 F.3d 130, 134 135 (3d Cir. Del. 2006).  Indeed, in Barber it cited with approval the Second Circuit's language in Sumner v. United States Postal Service, 899 F.2d 203, 209 (2d Cir. 1990), in which the court held that Title VII's opposition clause is triggered by formal EEOC proceedings "as well [as] informal protests of discriminatory employment practices... including making complaints to management."  A jury could reasonably conclude that plaintiff was putting defendant on notice that she was complaining of unlawful discrimination.

Defendant next argues that, even if plaintiff's January 2007 memo is protected conduct, the length of time between her January complaint and her termination in June is insufficient to establish a causal link between her protected activity and termination.  The record also must contain sufficient evidence from which the finder of fact can link the materially adverse action to retaliatory animus.  Moore, 461 F.3d at 346.  Two central factors are brought into play: (1) the

14

"temporal proximity" between the protected activity and the alleged retaliation and (2) the existence of any " 'pattern of antagonism in the intervening period.' " Id. (quoting Abramson, 260 F.3d at 288 (quoting Woodson, 109 F.3d at 920-21)). "Timing alone raises the requisite inference when it is "unusually suggestive of retaliatory motive." Id. "But even if 'temporal proximity ... is missing, [it is appropriate to] look to the intervening period for other evidence of retaliatory animus." Id. (quoting Krouse v. American Sterilizer Co., 126 F.3d 494, 503-04 (3d Cir.1997)). However, "[t]hese are not the exclusive ways to show causation" and it is important to consider all of the proffered evidence as a whole to determine whether it "may suffice to raise the inference." Id. (quoting Farrell, 206 F.3d at 280 and citing in support Kachmar v. SunGuard Data Systems, Inc., 109 F.3d 173, 178 (3d Cir.1997) ("The element of causation, which necessarily involves an inquiry into the motives of an employer, is highly context-specific.")).

Here, the timing of plaintiff's termination is suspect. Hill issued numerous warnings to plaintiff after she was placed under his supervision. He gave her warnings for things the finder of fact could conclude she did not do and failed to acknowledge things she did do. As noted earlier, Hill was removed from supervising plaintiff for a period of five months. During this time plaintiff's record of disciple improved. Hill nevertheless kept notes on plaintiff during the period when she was placed back under Bristol's supervision. After Hill regained supervisory control over plaintiff, plaintiff was terminated shortly thereafter. Hill had the discretion to terminate plaintiff and actually issued her termination letter. Thus, the finder of fact could conclude there was an ongoing atmosphere of antagonism between the two.

It follows that the finder of fact could conclude that (1) plaintiff's January memo alleged discrimination by Hill, (2) a history of antagonism existed and then became further exacerbated between the two, and (3) plaintiff was fired within a short period of time after she was placed back under Hill's supervision, and, based on such findings, a jury reasonably could conclude that a causal connection exists between plaintiff's submission of her January memo and her termination. Accordingly, defendant's motion for summary judgment on plaintiff's retaliation

claim under Title VII and the ADEA must be denied.

An appropriate order will follow.

Date: July 7, 2010

                                                          s/ David Stewart Cercone
David Stewart Cercone
United States District Judge

cc: John Black, Esquire
Ogg, Cordes, Murphy & Ignelzi
245 Fort Pitt Boulevard
Fourth Floor
Pittsburgh, PA 15222

Trisha A. Gill, Esquire
Walsh Collis & Blackmer PC
Suite 1400, Gulf Tower
707 Grant Street
Pittsburgh, PA 15219